# UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| vs. | : | CRIMINAL NO. 3:18CR127(VLB) |
| WILLIAM MILLETT | : | September 26, 2018 |

## DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

William Millett, through counsel, submits this memorandum in support of a departure and/or variance to a sentence of 60 months' imprisonment. The government, through Assistant United States Attorney Jacabed Rodriguez-Coss, has agreed not to oppose Mr. Millett's request for a downward departure/variance to a sentence of 60 months' imprisonment. Plea Agreement at 5-6. Mr. Millett also asks that the Court impose a term of supervised release of five years. He has already agreed to a set of rigorous conditions of supervised release in his written plea agreement.

I.    Introduction

Mr. Millett knowingly received and possessed a thumb drive containing child pornography and also knowingly received images of child pornography in his email.

Mr. Millett is not accused of producing or trading any child pornography and he has never abused a minor. Aside from his conduct in this case, he has no criminal history whatsoever, and he suffers from a traumatic personal history and severe learning disabilities and cognitive limitations that impact upon his functioning and behavior.

With Mr. Millett's lack of criminal history; his cognitive and mental condition, and its impact on his functioning, the holding of <u>United States v. Dorvee</u> instructing that unless the child pornography guideline is applied with great care it will likely lead to sentences that do not comport with § 3553(a); and an analysis of all of the other § 3553(a) factors, including the need to avoid unwarranted sentencing disparity, a sentence of 60 months is the correct sentence in this case

II.     Mr. Millett's history and characteristics

William Millett is 28 years old.   He had a chaotic childhood.   He never knew his biological father.   PSR ¶ 74.   His mother struggled with mental health and substance abuse disorders throughout his childhood.   <u>Id.</u>   At times, his mother would take the money he earned from employment and use it for herself.   As a result of the absence of his father, and the instability of his mother, Mr. Millett moved countless times between his mother's home, his grandparents' home, and the homes of numerous stepfathers.   PSR ¶¶ 74-79.   DCF intervened, and among other things, investigated educational and parental neglect.   PSR ¶ 78.   Mr. Millett was sexually abused by one of his mother's boyfriends when he was between 8 and 14 years old.   PSR ¶ 96.

Mr. Millett was diagnosed as learning disabled in school.   PSR ¶ 102.   He was deemed to be academically limited and to read at a kindergarten level.   He processed information slowly and required information to be repeated.   <u>Id.</u>   Educational records provided to the United States Probation Office confirm that pursuant to cognitive assessment performed on October 15, 1999, he was administered the Wechsler Intelligence Scale for Children - Third Edition, with the following results:

2

- **Verbal IQ: 72 (3rd percentile)**
- **Performance IQ: 90 (25th percentile)**
- **Full Scale IQ: 78 (7th percentile)**

He was also given the Comprehensive Test of Phonological Processing (Grade Equivalent) with the following results:

- **Elision: K.2 (1st percentile)**
- **Blending Words: 1.7 (16th percentile)**
- **Memory for Digits: K.4 (16th percentile)**
- **Rapid Digit Naming: 1.0 (2nd percentile)**
- **Non Word Repetition: 2.4 (37th percentile)**
- **Rapid Letter Naming: 1.2 (5th percentile)**

The results of the evaluation indicated that William was functioning within the "borderline" range of intelligence at that point in time.   Verbal abilities are significantly less developed than the average child his age.   The verbal IQ score is assessed at the 3rd percentile.   Vocabulary, verbal comprehension, general fund of information, and verbal reasoning are assessed within the 1st to 10th percentiles.   The results of Mr. Millett's evaluation were consistent with the Learning Disability identification; however, his profile was significantly more complicated by a number of factors, including the following:

- **Language and auditory processing deficits; and specifically deficits in phonological processing are related to the learning disability which impacts his academic functioning.   Language arts (reading and written language) is estimated to be at the Kindergarten level instructionally.**

- **What appears to be an attention deficit is related to difficulties in auditory processing, language difficulties, and may also be related to anxiety as he faces instruction where he has had a long history of failure and frustration.**

It was concluded and recommended that William's language scores qualify him for services as a language-disabled student.   However, after being placed in special education, he continued to struggle.   Pursuant to a test administered on May 15, 2000, he was administered the Woodcock Johnson test with the following results, many of which placed him in the first (lowest) percentile:

- o **Special Education**
    - ▪ **Woodcock Johnson (Standard Score, percentile)**
        - • **Letter-Word Identification (6, 1st)**
        - • **Passage Comprehension (7, 1st)**
        - • **Dictation (6, 1st)**
        - • **Writing Samples (11, 2nd)**
        - • **Word Attack (10, 1st)**
        - • **Reading Vocabulary (5, 1st)**
        - • **Proofing (11, 1st)**
        - • **Writing Fluency (12, 2nd)**
    - ▪ **Discussion:**
        - • **William is presently reading on a beginning Kindergarten level in language arts.**
        - • **William is presently performing on a beginning first grade level in math.**
    - ▪ **Behavioral Observations**
        - • **William expressed that portions of the test were "too easy", this was a way to avoid the test without admitting that it was difficult for him.**

In 2002, he continued to test well below grade level in spite of receiving 12.5 hours of special education per week.   In May of 2002, when he was 11, he received a psychoeducational assessment that helped contextualize that Mr. Millett's behavioral issues were defensive coping mechanisms due to his severe learning disabilities. The report stated:   "William has a severe learning disability that impacts reading and language arts.   He continues to lag significantly behind peers in language arts despite intensive intervention for the past few years.   He has had a history of behavioral difficulties that appear to be related to inappropriate coping and

4

defensiveness regarding his disability." In 2003, he was given additional testing, showing the following limitations:

- Otis-Lennon School Ability Test, Sixth Edition
  - Verbal: below average
    - Verbal comprehension 3/12
    - Verbal reasoning 6/24
  - Nonverbal: below average
    - Figural reasoning 9/18
    - Quantitative reasoning 9/18
  - Total: below average
    - Score: 27/72
- Connecticut Mastery Test
  - Reading Comprehension
    - Forming and initial understanding: 2/10
    - Developing and interpretation: 0/7
    - Demonstrating a critical stance: 1/13
  - Writing
    - Composing/revising: 6/18
    - Editing: 6/18

In addition, the records contain numerous examples of parental neglect and absenteeism, as well as possible educational neglect, and overall, do not portray an involved mother, but rather a mother who came in and out of the picture at will. For examples, the records reflect a 3/2/1998 letter home from principal. He was very concerned about William's mother's 3-4 week absence and noted that friends and relatives tried to pitch in. In addition, he noted that the inconsistency of an adult's presence in the home life of the boys in recent weeks is of great concern to him as he is a mandated reporter, continued instances of inconsistent parenting support will cause him to contact DCF on their behalf. In addition, a kindergarten report from December 1996 noted that the most important factor for William to succeed was regular attendance. A number of school absences were noted in third grade through seventh grade (up to 24 days absent in one year). A 1996 PPT remarked that his

attendance was inconsistent.   In addition, a November 1996 psychological report noted that William has had a turbulent early childhood.   William's parents separated in 1995, the same year that his own house burned.   William has had multiple ear infections and may have had transient or sustained hearing loss.   William looked tired, lethargic, and congested.   Speech articulation was weak.

Mr. Millett was brutally bullied in school.   PSR ¶ 96.   Children called him "stupid" or "retard" and would write mean things about him on the board when the teachers walked out of the classroom.   Id.   In addition, other children shoved him into lockers and pushed him down the stairs and in hallways.   Id.   Mr. Millett reported the bullying to school counselors and principals, but the bullying continued nevertheless.   Id.

In spite of his learning disabilities and cognitive limitations, Mr. Millett has a significant history of employment.   He has worked principally in landscaping and construction and has maintained steady employment for the last 11 years since he was 16 years old.   PSR ¶¶ 106-08.

Mr. Millett has been attending a mental health and sex offender class at Wyatt. Both have been beneficial to him and he is amenable to continuing treatment while incarcerated and following his term of incarceration.   He has a plan for the future that includes completing his education, resuming work in landscaping, and continuing to engage in treatment.

III.     **The advisory Guidelines range is severely flawed and will produce a sentence greater than necessary to comply with the purposes of sentencing**

A.     **The <u>Dorvee</u> decision[1]**

The strictly advisory nature of the Guidelines is particularly important in cases, like this one, applying § 2G2.2.   Sentencing courts are ordinarily expected to give a certain amount of deference to the judgement of the Sentencing Commission, because of its role as an expert agency.   As the Supreme Court has explained:

> Congress established the Commission to formulate and constantly refine national sentencing standards.   Carrying out its charge, the Commission fills an important institutional role: It has the capacity courts lack to base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise.

<u>Kimbrough v. United States</u>, 552 U.S. 85, 108-09 (2007).   However, in some cases, the Guidelines "do not exemplify the Commission's exercise of its characteristic institutional role."   <u>Id.</u> at 109.   In such cases, where the applicable Guidelines ranges are based on Congressional dictates and not on "empirical data and national experience," the Guidelines are not entitled to the same deference, particularly when the Commission itself has expressed concern that the Guidelines ranges are unreasonable.   <u>Id.</u> at 109.

That is precisely the case in regard to the Guidelines for possession of child pornography, as the Second Circuit held in <u>Dorvee</u>, and <u>United States v. Tutty</u>, 612 F.3d 128 (2d Cir. 2010).   The Second Circuit explained its concerns about the child

---

[1]It should be noted that while <u>Dorvee</u> is used in many contexts as an argument regarding the appropriateness of the Guidelines, in this particular case, <u>Dorvee</u> is directly applicable.

pornography guidelines at some length in <u>Dorvee</u>, beginning by observing that these cases involve "a Guideline that is fundamentally different from most and that, unless applied with great care, can lead to unreasonable sentences that are inconsistent with what § 3553 requires." <u>Dorvee</u>, 616 F.3d at 184. Other courts had previously reached a similar conclusion. <u>See</u>, <u>e.g.</u>, <u>United States v. Riley</u>, 655 F. Supp.2d 1298 (S.D. Fla. 2009); <u>United States v. Grober</u>, 595 F. Supp.2d 382 (D.N.J. 2008); <u>United States v. Stern</u>, 590 F. Supp.2d 945 (N.D. Ohio 2008); <u>United States v. Doktor</u>, 2008 WL 5334121 (M.D. Fla. Dec. 19, 2008); <u>United States v. Johnson</u>, 588 F. Supp.2d 997 (S.D. Iowa 2008); <u>United States v. Noxon</u>, 2008 WL 4758583 (D. Kan. Oct. 28, 2008); <u>United States v. Shipley</u>, 560 F. Supp.2d 739 (S.D. Iowa 2008); <u>United States v. Baird</u>, 580 F. Supp.2d 889 (D. Neb. 2008).

Since 1990, the Guidelines relating to child pornography have been amended numerous times, in a manner that "diverges significantly from the Sentencing Commission's typical empirical approach[.]" <u>United States v. Hanson</u>, 561 F. Supp.2d 1004, 1008 (E.D. Wis. 2008). Rather than being based on empirical study and analysis of offender characteristics, recidivism rates, and other objective evidence, the increases to these Guidelines have been dictated by Congressional demand and political concerns.

As the Second Circuit held in <u>Dorvee</u>, the Guidelines' provisions embodied in § 2G2.2 were not developed using the Commission's usual empirical approach based on past experience. "Instead, at the direction of Congress, the Sentencing Commission has amended the Guidelines under § 2G2.2 several times since their introduction in 1987, each time recommending harsher penalties." <u>Dorvee</u>, 616 F.3d

8

at 184.   These amendments were enacted in a manner that "diverges significantly from the Sentencing Commission's typical empirical approach[.]"   As a result, these Guidelines' provisions are entitled to little deference, and when imposing sentence, a District Court should feel free to disagree with the recommendations of these provisions.   Cf. Spears v. United States, 555 U.S. 261, 266 (2009) (confirming that sentencing court may vary from Guidelines on policy grounds).

The Third Circuit has summarized the history of § 2G2.2, and concluded:

> As described in the Commission's 2009 Report, and as discussed by the Second Circuit in Dorvee, and, by now, numerous district courts, § 2G2.2 was not developed pursuant to the Commission's institutional role and based on empirical data and national experience, but instead was developed largely pursuant to congressional directives. As one district court put it, "the Commission probably did the best it could under difficult circumstances, but to say that the final product is the result of Commission data, study, and expertise simply ignores the facts."   Diaz, 720 F. Supp.2d 1039, 1045 (E.D. Wis. 2010).

United States v. Grober, 624 F.3d 592, 608 (3d Cir. 2010) (internal citations and footnote omitted).

The most recent significant changes – changes that increase Mr. Millett's Guidelines dramatically – were dictated by Congress in the PROTECT Act of 2003. "Notably, the Sentencing Commission was neither informed nor consulted on the passage of these changes, and the legislative history surrounding them offered no study or empirical justification for them."   Dorvee, 616 F.3d at 185, n. 7.   In fact, a former United States Attorney cited by the Dorvee Court described the PROTECT Act's directives to the Commission as the "most significant effort to marginalize the role of the Sentencing Commission . . . since the Commission was created by

Congress." Id.

Strikingly, not only was the Commission not *consulted* about these changes – which severely increased sentences for child pornography defendants – but it openly *opposed* many of them.   See id. at 185; United States v. Beiermann, 599 F. Supp.2d 1087, 1105-06 (N.D. Iowa 2009); Hanson, 561 F. Supp.2d at 1009 ("The Court is particularly troubled that the Guidelines for sentencing those who possess child pornography have been repeatedly raised despite evidence and recommendation by the Commission to the contrary.").   The Commission resisted both the increased offense levels for simple possession cases, and the proliferation of "enhancements" for various factors that "are all but inherent in the offense of conviction" and drive the adjusted offense levels for even minor offenders to approach the statutory maximum. Dorvee, 616 F.3d at 186.   In the end, thanks to this aggressive Congressional intervention,

> § 2G2.2 eviscerated the fundamental statutory requirement in § 3553(a) that district courts consider "the nature and circumstances of the offense and the history and characteristics of the defendant" and violates the principle, reinforced in Gall, that courts must guard against unwarranted similarities among sentences for defendants who have been found guilty of dissimilar conduct.

Id. at 187.

Summing up the absurdity of these guidelines, the Dorvee Court stated: "[A]dherence to the Guidelines results in virtually no distinction between the sentences for defendants like Dorvee, and the sentences for the most dangerous offenders who, for example, distribute child pornography for pecuniary gain and who fall in the higher criminal history categories." Id. at 187.   The advisory sentencing

10

range in this case is a perfect example of the extreme results that are reached by the system currently embodied in § 2G2.2 of the Guidelines, and of the kind of irrational result the <u>Dorvee</u> Court cautioned against.

As a preliminary matter, the base offense level itself is unreasonably high. And yet, the base offense level is not the only problem.   Due to a number of enhancements under § 2G2.2, the recommended range is 87-108 months.   While there is no dispute that these enhancements are factually supported in this case by the record (and have been agreed to by Mr. Millett), they result, both individually and in conjunction with one another, in a very unreasonable sentencing range.   The enhancements "thus, blur[] logical differences between least and worst offenders, contrary to the goal of producing a sentence no greater than necessary to provide just punishment."   <u>Beiermann</u>, 599 F. Supp.2d at 1105.

Indeed, the Second Circuit observed that four of the specific enhancements applicable to Mr. Millett's case – a two-level enhancement for use of a computer; a four-level enhancement for possessing between 300 and 600 or more images; a four-level enhancement for material portraying sadistic or masochistic conduct; and a two-level enhancement for material involving a prepubescent minor – are actually "all but inherent in the offense of conviction."   <u>Dorvee</u>, 616 F.3d at 186.   Indeed, these offense level increases embodied in § 2G2.2 "apply in nearly all cases."   <u>Dorvee</u>, 616 F.3d at 186.   A discussion of the fairness of applying these enhancements will each be taken up, in turn.

**B.      The enhancement for use of a computer is flawed and should be rejected as a matter of policy, and in this case specifically**

The most dramatic example of the flawed guideline is the increase of two levels set forth in § 2G2.2(b)(6) for use of a computer in connection with obtaining and viewing child pornography.   As one expert in the field has noted, it is now nearly impossible to obtain child pornography through any means *other* than the internet.  See *At Issue:   Child Sexual Abuse*, Angela Lewis, Ed., Greenhaven Press (2005). And as the former Chief Judge of the District of Oklahoma frustratingly stated before a regional hearing before the U.S. Sentencing Commission in 2009, "as widespread as computer use is now, enhancing for use of the computer is a little like penalizing speeding, but then adding an extra penalty if a car is involved."   Federal Sentencing Practices and the Operation of the Federal Sentencing Guidelines:   Reg'l Hearing Before the U.S. Sentencing Commission at 6 (July 2009) (Statement of J. Robin Cauthron).   As a result, the computer enhancement smacks of "double-counting," as the Second Circuit has noted, "because it effectively increases a defendant's sentence to reflect the kind of harm that has already been fully accounted for by the base offense level or other enhancements."   Tutty, 612 F.3d at 132 (internal citation and quotation marks omitted).

The computer enhancement may be the single most widely applied increase in the entire Guidelines system – 97.2% of the sentences imposed under § 2G2.2 in 2009 implicated this enhancement.   See Dorvee, 616 F.3d at 186; see also Bureau of Justice Statistics Bulletin:   Federal Prosecution of Child Sex Exploitation Offenses, (2006) at 5.   As such, it *necessarily* fails to distinguish among offenders in any

meaningful way.   For instance, it makes no distinction between using a computer to create child pornography and using a computer solely to trade it to view it – the kind of distinction that would actually be significant in determining an appropriate sentence.

The Commission identified two possible harms that could result from use of a computer in connection with child pornography offenses:

> The seriousness of a crime involving computerized trafficking in child pornography depends in part on 1) the degree to which the computer use facilitates the widespread and instantaneous distribution of the images, and 2) the degree to which it increases the likelihood that children will be exposed to the images.

See USSC, Report to Congress, Sex Offenses Against Children (1996) at 28. Congress identified four bases for increasing penalties for offenses involving computers:

> (1) the wide dissemination and instantaneous transmission in computer-assisted trafficking of child pornography, (2) the increased difficulty of investigation and prosecution by law enforcement officials, (3) the increased likelihood that child pornography will be viewed by and harm children, and (4) the potential for pedophiles to lure children into sexual relationships through the computer.

H.R. Rep. No. 90, 104th Cong., 1st Sess. 3-4 (1995), reprinted in 1996 U.S.C.C.A.N. 759. Where, as here, the gravamen of the offense is viewing child pornography, the fact that a computer was used to view the images is insignificant.   Yet, the increase applies regardless of whether it reflects any of the potential harms actually identified by Congress or the Commission.   Under such circumstances, "adherence to the Guidelines results in virtually no distinction between the sentences for [lower level defendants] and the sentences for the most dangerous offenders[.]"   Dorvee, 616

F.3d at 187.

When this enhancement was first introduced, the Internet was in its infancy, and just "28% of offenders used computers."   See "A Method for Careful Study:   A Proposal for Reforming the Child Pornography Guidelines," Troy Stabenow, Federal Sentencing Reporter, Vol. 24, No. 2, December 2011 at 122 (hereinafter Stabenow). However, as early as 1996, the Commission had already identified concerns about the enhancement that have since become a reality:

> Online pornography comes from the same pool that can be found in specialty magazines or adult bookstores . . . thus, the difference between print and computerized porn is not in the content of the images, but in the means of distribution . . . "Downloading" cyberporn is similar to receiving pornography through the mail  . . . At the other end are large-scale, commercial pornographers.   Creating and maintaining a B[ulletin] B[oard] S[ystem] or Website with pornography is similar to opening an adult bookstore . . . persons who upload, send, or post illegal images to accessible sites should be held accountable for the harm done when child pornography is widely disseminated or falls into the hands of children . . .[but] what seems apparent is that a person's culpability depends on *how* they use a computer.

> Not all computer use is equal . . . sentencing policy should be sensitive to these differences in culpability so that punishments are tailored to fit the circumstances of each individual's case.

> The adjustment does not distinguish between persons who email images to a single, voluntary recipient and those who establish a BBS and distribute child pornography to large numbers of subscribers . . . the two-level adjustment might be narrowed to apply only to cases that involve distributing child pornography in a way that makes it widely accessible, such as posting it on a BBS or Website.   However, a statutory amendment may be necessary to make these kinds of distinctions, because the current statutory directive is aimed broadly at all persons who use a computer to transmit child porn, including all receivers and possessors.

Id., quoting U.S. Sentencing Commission, Report to the Congress:   Sex Offenses

14

Against Children – Findings and Recommendations Regarding Federal Penalties (1996), available at http://www.ussc.gov/Legislative_and_Public_Affairs/Congressional_Testimony_and -Reports/Sex-Offense-

Topics/199606_Rtc_Sex_Crimes_Against_Children/199606_Rtc_SCAC.PDF at 28-29.

Judges have ruled that there is no empirical data showing that using a computer as a means to obtain and view pornography is more serious than receiving it through the mail.  See United States v. Tapp, 2010 WL 4386523 at 6 (N.D. Ind. Oct. 28, 2010); United States v. Hanson, 561 F. Supp.2d 1004, 1010-11 (E.D. Wis. 2008).   In fact, "both government officials and recidivism scientists now believe that non-Internet access of child pornography is a greater indicator of culpability and danger." Stabenow at 122.  Empirical studies seem to indicate that "offenders convicted of crimes involving non-Internet child pornography were a higher risk of sexual re-arrest than were the offenders whose sexual crimes were restricted to the Internet."  Id., quoting Michael Seto, Karl Hanson, & Kelly Babchisin, Contact Sexual Offending by Men with Online Sexual Offenses, Sexual Abuse 124, 138 (2011).  As Stabenow offers, it may be that acquiring print media of child pornography requires greater forethought and intentionality as, for example, using the mail seems less susceptible to detection.  Id.  Or, "it could be that offenders who only engage in activities on the Internet somehow view their Internet use as mere fantasy that is separable from their real (vs. online) lives, and are thus less likely to engage in misconduct offline."  Id.

_____

As he sums up:

> Imposing an increased punishment for an act that involves less effort and appears to signify a smaller risk of future dangerousness is simply not rational . . . There is nothing either principled or dignified about standing in front of the public arguing over whether to impose a higher or lower sentence based on where a defendant sat in the living room while watching an illegal movie.   No matter how the court rules, the fact that the sentence hinged on that variable detracts from public respect for the law.

Stabenow at 122-23.   For all of the above reasons, while it cannot be disputed that the two-level computer enhancement applies in this case, the Court should exercise its discretion to reduce the adjusted offense level by two levels to undo the effect of the increase.

C.    The number of images enhancement is also flawed and thus should be rejected as a matter of policy, and in this case specifically

Mr. Millett's offense level is increased by another *four* levels under § 2G2.2(b)(7)(C), because more than 300, but less than 600, images of child pornography were found on the thumb drive and in his email.   But that quantity is not actually unusual at all; at least some enhancement for quantity applies in 96.6% of all cases, see Dorvee, 616 F.3d at 186 n.9, rendering this increase, like the computer increase, incapable of differentiating between offenders.   Even a five-level increase imposed for greater than 600 images applies in more than 63% of cases.   See Dorvee, 616 F.3d at 186.   Such a serious additional penalty is not anchored, however, in any real assessment of the seriousness of the offense conduct.   The "number of images" enhancement is a rough tool, at best, and has no practical value for sorting offender culpability or danger and thus is deserving of no deference.

16

As the <u>Dorvee</u> court has made clear, the number of images enhancement is based on no study or evidence.   In fact, it was the first instance since the inception of the Guidelines where Congress directly amended the Guidelines Manual. <u>Stabenow</u> at 123.   In his article, Stabenow traces the troubling history of how this particular enhancement became law:

> The provision was authored by Jay Apperson, aide to Rep. Sensenbrenner of Wisconsin.   Instead of submitting the matter to his boss, a Congressman familiar with Guidelines issues from his role as chairman of the House Judiciary Committee, Apperson approached freshman representative Tom Feeney. Rep. Feeney had, at that point, only one bill to his Congressional record, a resolution to recognize the cheerleaders of the University of Central Florida.   As was likely intended, Rep. Feeney undertook no study of the measure before inserting it as a last-minute addition to the large and complicated Amber Alert bill being presented for Congressional vote.   The amendment itself was a small insertion to the overall Amber Alert bill, and 'the image enhancements,' written by Apperson, 'exist as unexplained sentence increases that are not tied to the purpose of the overall amendment in which they appear.'   No empirical basis for the enhancement was ever offered.

<u>Id.</u>, quoting Public Hearing Testimony and Transcript:  2009-2010 Regional Public Hearings, available at <u>http://www.ussc.gov/hearings.htm</u> at 11-12.   Now, even eight years later, there are still no studies or evidence that this enhancement helps sort offenders by moral culpability or that it effectively predicts risk or danger regarding future conduct.   <u>See</u> <u>id.</u>   "To be blunt, thousands of inmates are each receiving years longer to their terms of confinement, at great expense to the American taxpayer, because a Congressional aide had a wild hare of an idea."   <u>Id.</u>

In summarizing the flaws to the number of images enhancement, Stabenow states the following:

17

(1)    **With each short video clip counting 75 images, 600 images is a very low cap.**

(2)    **A majority of offenders receive the maximum enhancement for number of images, and almost all offenders receive some enhancement, <u>see</u> U.S. Sentencing Commission, Use of Guidelines and Specific Offense Characteristics: Fiscal Year 2010 at 37, available at <u>http://www.ussc.gov.</u>**

(3)    **Those assessed fewer images may actually have accessed many more images.**

(4)    **Individuals with fewer images may have had a much greater market effect, whereas those with 600-plus images may have had none.**

(5)    **The number of images enhancement can effectively double a sentence.**

(6)    **The focus on a simple yes-no test leads to cursory investigations in which participants in the system have no incentive to analyze the context of the images.**

(7)    **There is no empirical evidence that the number of images reliably assess culpability or dangerousness, and**

(8)    **The focus on the number of images has distracted everyone from exploring more reliable ways to differentiate offense conduct.**

<u>Stabenow</u> at 125-26.

Moreover, as a practical matter here, there is no evidence that Mr. Millett ever actually opened the thumb drive containing many of the images.   Unlike many other cases, there is no evidence that he opened the thumb drive on a computer, nor that he categorized or repeatedly viewed the images.   Also, in this case, the reason why the image count is so high is due to the presence of a few videos, which skews the counting of images under the Guidelines.   In point of fact, Mr. Millett actually received far fewer images than the vast number of defendants charged in these cases. Based on all of these reasons, this Court should reject a four-level enhancement for the number of images that Mr. Millett is being assessed under the Guidelines.

**D.    The sadistic or masochistic conduct enhancement is also flawed and should be rejected as a matter of policy, and in this case specifically**

A single image can result in this large four-level increase.    And, as interpreted in the case law, the enhancement generally applies to any image that, by its creation, is likely to have caused physical or emotional pain, even if no evidence of pain or particular cruelty can be seen in the image.    See United States v. Lyckman, 235 F.3d 234, 238 (5th Cir. 2000).    This would encompass basically any sexual contact between an adult and a minor under 12, regardless of whether it fits the normal connotation of sadism or masochism and even if it contains no overt celebration of pain or humiliation, because it is presumed that the sexual act will either cause physical pain or emotional distress.

Furthermore, the typical trader will inevitably obtain some images and videos containing depictions of sadistic or masochistic conduct when he downloads material.    It should be no surprise therefore that the enhancement applies to 73.4% of defendants.    See Dorvee, 616 F.3d at 186.    Arguably, it would be assessed even more frequently under the case law's definition of sadistic or masochistic content but for certain prosecutors who do not push the enhancement recognizing its unfair application.    As Stabenow states, "what is really needed is a system that encourages all parties to carefully evaluate the evidence and that allows the judge to efficiently adjust for gross deviance when it is present to an unusual degree."    Stabenow at 128. This significant enhancement of four levels should be rejected in this case.

**E.**    **The enhancement for images of prepubescent children is also flawed and should be rejected as a matter of policy, and in this case in particular**

The offense level in Mr. Millett's case is further increased by two levels under §

2G2.2(b)(2) for images involving children under the age of 12.    The fact that Mr. Millett

had such images is hardly surprising, given that nearly 95% of all child pornography

cases involve images of prepubescent children.    See <u>Dorvee</u>, 616 F.3d at 186.    It is

essentially part and parcel of child pornography possession.    Here again, this

enhancement does absolutely nothing to distinguish among offenders or offense

conduct, or to punish more serious crimes more harshly, or to account for likelihood

of recidivism or risk to the community.    <u>Cf.</u> <u>United States v. Schinbeckler</u>, 2011 WL

4537907 at *6 (N.D. Ind. Sept. 29, 2011) (declining to give effect to this increase

because such images are in fact "typical" of the offense).

In sum, with Mr. Millett already starting with a base offense level of 22, and

given that this assessment applies to nearly 95% of all offenders, does not this hefty

base-offense level already cover the fact that the offender has viewed these types of

images?   Put another way; is it not unjust to enhance an offender's sentence for

conduct that is all but inherent in the offense?    This Court should reject this flawed

enhancement as well.

**F.**    **A better way to calculate a Guidelines range that better approximates a starting point for a sentence that roughly comports with the sentencing factors**

The extremely high offense levels for non-production child pornography

offenses creates a further anomaly in the consideration of criminal history that also

renders them unreasonable.    Mr. Millett is in CHC I.    He has never been in trouble

with the law before, yet is subject to an advisory range of 87-108 months.    Yet, a

defendant with no criminal history, and with no aggravating circumstances, should presumably be at the bottom of the statutory range, at or near no incarceration. Thus, the system created by § 2G2.2 flies in the face of the Guidelines' own mantra that "[a] defendant with a record of prior criminal behavior is more culpable than a first offender and thus deserving of greater punishment." USSG § 4A, Intro. Cmt.

Indeed, § 2G2.2 is producing sentencing ranges in excess of violent offenders with a history of recidivism. By way of quick example, an offender convicted of aggravated assault with a firearm that resulted in bodily injury, and with a criminal history placing him in Category II, would only have a range of 46 to 57 months, almost half that of Mr. Millett's range.

Mr. Millett respectfully urges the Court to reject the child pornography guideline outright as producing sentences that are greater than necessary to achieve the goals of § 3553(a). See Dorvee, 616 F.3d at 188 (the district court may vary from the child pornography guideline solely based on a policy disagreement with the guideline even where that disagreement applies to a wide class of offenders). In the alternative, and in an effort to arrive at a better Guidelines-starting-point, the Court might consider using § 2G2.2's base offense level and then discounting the effect of the enhancements by half, which would result in a range right near the statutory mandatory minimum. Alternatively, the Court could simply consider that the statutory mandatory minimum of 60 months is a fair, just, and reasonable sentence in this case in light of Mr. Millett's lack of prior criminal history and other mitigating factors including his cognitive limitations.

The Third Circuit affirmed a below-Guidelines sentence in a child pornography possession case where the district court rejected the draconian enhancements discussed above as not reflecting characteristics of the specific offense:

> The sentence imposed on Maguire was substantively reasonable . . . In choosing not to add the enhancements, the District Court explained its intent to sentence Maguire only for the crime he committed and not add automatic enhancements, which did not really reflect a specific crime, but which it viewed as being generally applicable to all child pornography cases.

United States v. Maguire, 436 Fed. Appx. 74, 78, 2011 WL 2689013 at *4 (3d Cir. July 12, 2011).   This analysis applies with equal force to Mr. Millett's case and this Court should do the same – reject the enhancements as a general policy matter, and as applied to Mr. Millett specifically.

IV.    A downward variance is appropriate in this case based on a combination of factors

In addition to the Guidelines' arguments discussed above, a number of factors are present in this case which, in combination, call for a downward departure and/or variance to the requested sentence of 60 months.   Among these factors are the following:   (1) Mr. Millett has never been in trouble before and has never spent any time in prison; (2) Mr. Millett suffers from cognitive limitations that made him susceptible to offending; and (3) the 3553(a) factors.

A.    Mr. Millett has never served any time in prison before

As reflected in the PSR, prior to his incarceration in this case, Mr. Millett has never been convicted of any crime and was never incarcerated before.   The Court should consider the concept of incrementally proportionate sentencing here.

22

In <u>United States v. Mishoe</u>, 241 F.3d 214, 220 (2d Cir. 2001), the Second Circuit stated:

> Obviously, a major reason for imposing an especially long sentence upon those who have committed prior offenses is to achieve a deterrent effect that the prior punishments failed to achieve.   That reason requires an appropriate relationship between the sentence for the current offense and the sentences . . . for the prior offenses.

While the <u>Mishoe</u> decision principally addressed the Career Offender Guidelines, the teaching of that decision applies here.   Specifically, the concept of incremental punishment is relevant to the sentencing goal of deterrence.   Where an individual has never been incarcerated before, as is the case here, a sentence within the Guidelines range would be excessively severe.   That is because there is no reason to believe in such an instance that a prolonged period of incarceration would be more effective than a lesser sentence, because there is no point of comparison or historical example to disprove the efficacy of a lower sentence.   <u>See</u>, <u>e.g.</u>, <u>United States v. Bun</u>, 13cr174(SRU), Judgment (dkt. # 72) (citing <u>Mishoe</u> and stating that "The sentence imposed represents an incremental increase that should be sufficient to serve the purposes of sentencing."); <u>United States v. Keels</u>, 15cr17(JCH) (imposing below-Guidelines sentence based in part on the concept of incrementally proportionate sentencing philosophy).   In addition, in the Sentencing Reform Act, 28 U.S.C. § 994(j), Congress instructed the Commission to "ensure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender . . . ."   The Commission ignored that directive.   <u>See</u> <u>United States v. Germosen</u>, 473 F. Supp.2d 221, 227 (D. Mass. Jan. 18, 2007).   In

**Germosen**, the District Court, imposed a below-Guidelines sentence based upon aberrant behavior, lack of criminal history, and recidivism statistics from the United States Sentencing Commission.   See United States v. Germosen, 473 F. Supp.2d 221, 227 (D. Mass. Jan. 18, 2007).   The Court noted that "[m]inimal or no prior involvement with the criminal justice system is a powerful predictor of a reduced likelihood of recidivism."   Id. (citing United States Sentencing Commission, A Comparison of the Federal Sentencing Guidelines Criminal History Category and the U.S. Parole Commission Salient Factor Score, 15 (Jan. 4, 2005), http// www.ussc.gov/publicat/RecidivismSalientFactorCom.pdf.).

For a person with no criminal convictions and no previous incarceration, a sentence of 60 months' incarceration is sufficient to serve the sentencing goals of deterrence and punishment.

**B.    Mr. Millett suffers from cognitive limitations that impacted upon his behavior.**

Pursuant to U.S.S.G. § 5H1.3, a downward departure based upon mental and emotional conditions is warranted when (i) the "conditions, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines."   Mr. Millett's case falls squarely within this departure.   The government has agreed not to oppose Mr. Millett's request for a departure to a sentence of 60 months' imprisonment.   Plea Agreement at 5-6.

As described at length above and in educational records, Mr. Millett suffers from a low IQ that placed him, at times, in the first and third percentiles of the

24

population.   He struggled, in particular, with verbal processing.   Although he did receive special education services, he continued to struggle with cognitive limitations and did not receive the full spectrum of support he needed.   Instead, he was largely untreated, unsupervised, neglected, and abused.

**C.      Consideration of the purposes of sentencing under 18 U.S.C. § 3553(a)**

While the statutory sentencing factors have been indirectly discussed already throughout this memorandum, it is useful at this point to examine each one individually. [2]   Pursuant to § 3553(a), the Court must impose a sentence that is "sufficient, but not greater than necessary" to achieve the following purposes:   (1) to reflect the seriousness of the offense and to provide just punishment; (2) specific and general deterrence; (3) incapacitation; (4) rehabilitation; and (5) the need to avoid unwarranted sentencing disparity.

**1.      The need for the sentence to reflect the seriousness of the offense and to provide just punishment**

First, the Court must consider the need for the sentence imposed to reflect the seriousness of the offense and to provide just punishment for the offense.   It is certainly acknowledged that this offense is a serious one as victims of abuse who have been filmed continue to feel violated knowing the images are forever circulating. However, while in no way minimizing the conduct, when considering Mr. Millett's specific offense conduct, and as already explained, he was not a creator of child porn images.   He has never abused any child, and his viewing of child pornography did

_____

[2]Some of the points and arguments already advanced will inevitably be repeated throughout this section.

not affect the marketplace in any way.   And, significantly, while the number of images recovered from his computer was greater than 300, his saved files certainly did not rival some of the collections seen in many of the other cases before judges in this District, see infra, or the length of time many of the other defendants have possessed child pornography, see infra.

As for "just punishment," Mr. Millett should be punished less than a repeat felony offender who has already served jail or prison time.   This is Mr. Millett's first criminal offense, and, again, based on all of the points raised in this memorandum, he should be punished with a sentence of 60 months.

Finally, when considering the issue of punishment, it is well to consider the very serious collateral consequences that flow from the conviction:   he is now a felon for life; and he will, of course, be required to register as a sex offender with all of the personal struggles and collateral consequences that go with that.   In short, putting the issue of jail time aside for a moment, Mr. Millett has already been significantly punished, and will continue to be punished, based on the very significant consequences of his arrest and conviction.

### 2.   Deterrence

The Court must also consider the need for the sentence to provide adequate general and specific deterrence.   Regarding general deterrence, it is always difficult to calibrate how severe a sentence is needed to adequately deter others.   In fact, research to date generally indicates that increases in the *certainty* of punishment, as opposed to the *severity* of punishment, are more likely to produce deterrent benefits. See Valerie Wright, Ph.D., "Deterrence in Criminal Justice, Evaluating Certainty vs.

Severity of Punishment," The Sentencing Project, November 2010 at 4.   See also Michael Tonry, Purposes and Functions of Sentencing, 34 Crime and Justice:   A Review of Research 28-29 (2006) (summarizing recent deterrence studies for the proposition that there is no evidence to support the assumption that longer sentences effectuate greater deterrence); Beiermann, 599 F. Supp.2d at 1103-04 (noting a "sentence should not be longer simply to satisfy [general deterrence –] an objective that, while laudable, is not being achieved according to any empirical or other evidence . . .").   Even so, however, a 60-month prison sentence, supervised release for at least five years, and sex-offender registration, should indeed deter would-be offenders just as well as a longer sentence should.   A long prison sentence, on the other hand, even assuming that it would do the most to generally deter others (something for which there is no evidence), is simply not appropriate in this case and thus, general deterrence is outweighed by the other factors in this case.

Regarding specific deterrence, the arrest, conviction, and impending sentencing, as well as the prospect of prison time, has already greatly deterred him from ever viewing child pornography again.

And most importantly, in the context of child pornography offenses, recidivism rates are very low across *all* demographics for these offenses, and child pornography offenders appear to be far more compliant with supervision than other offender populations with recidivism rates for offenders on supervision or in treatment particularly low.   Stabenow at 121, citing, e.g., Seto & Williams, Examining the Criminal History and Future Offending of Child Pornography Offenders:   An

**Extended Prospective Follow-up Study**, 35 Law & Hum. Behav. 466 (Dec. 2011).[3] Based on all of these factors, anything greater than a 60-month prison term would be unnecessary in this case to deter Mr. Millett.

### 3.    Incapacitation

The Court also must consider the need for the sentence imposed to "protect the public from further crimes of the defendant."   Since the Commission's hearing on child pornography in February 2012, more judges have discussed the flaws with the child pornography guidelines and questioned any notion that viewing child pornography automatically equates with a risk of contact sex offenses.   See United States v. Marshall, 2012 WL 2510845, *2 (N.D. Ohio June 29, 2012) (Judge Zouhary rejected the presumption in the guidelines that "those who view child pornography are indistinguishable from those who actually abuse children," finding instead that the "[e]mpirical data strongly suggests that viewing child pornography does not equate to child molestation").

Judge Black in the District of New Mexico reached a similar conclusion, rejecting the government's suggestion that a higher sentence for receipt of child pornography was in order "because of the chance that [the defendant] will molest children in the future, or that he has in the past."   United States v. Kelly, 2012 WL 2367084, *5 (D.N.M. June 20, 2012).   The court concluded that "[a]ny Guideline based

---

[3]It is well to note that the Seto & Williams study found that offenders with prior criminal histories are more likely to recidivate, as are those with concurrent violent offenses.

on unsupported fears, rather than actual evidence, is far more likely to render unreasonable sentences." <u>Id.</u>

In his article, Stabenow reviews a number of studies assessing whether there is, in fact, a real correlation between viewing child pornography and risk to society. <u>See</u> <u>Stabenow</u> at 114-122.   He concludes that the studies clearly show that there is *not* such a correlation.   <u>Id.</u> at 121, citing, <u>e.g.</u>, Seto & Williams, <u>Examining the Criminal History and Future Offending of Child Pornography Offenders:   An Extended Prospective Follow-up Study</u>, 35 Law & Hum. Behav. 466 (Dec. 2011).

### 4.   Rehabilitation

Additionally, the Court must consider the need for the sentence imposed to "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."   18 U.S.C. § 3553(a)(2)(D).   Imprisonment is not an appropriate means of promoting rehabilitation.   <u>See</u> 18 U.S.C. § 3582(a) ("The court, in determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in § 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation.").

Mr. Millett is engaged in treatment and is willing to continue doing so.

### 5.   The need to avoid unwarranted sentencing disparity

Cases in this District bear noting.   For example, in <u>United States v. Paul Hubbard</u>, Criminal No. 3:16cr126(VAB), the Court in that case (Judge Bolden) imposed a sentence of 18 months' imprisonment on Mr. Hubbard, a first time offender, for the

crime of possession of child pornography.   On April 2, 2013, Judge Covello sentenced Carl Koplin, to 51 months after he pled guilty to receipt and distribution of child pornography.   As the United States Attorney's Office stated in a press release, "this defendant's appalling collection of child pornography was one of the largest that we have seen here in Connecticut . . . it's reprehensible that a practicing physician who held such an important position of trust in the community victimized so many children by collecting and trading sexually explicit images of them."   On February 15, 2013, this Court sentenced Rolan Sosa to 60 months after he pled guilty to receipt and distribution of child pornography.   See United States v. Rolan Sosa, Criminal No. 3:12cr215(VLB).   On January 18, 2013, this Court sentenced Steven Lewis to 24 months after he pled guilty to receipt and distribution of child pornography.   See United States v. Steven Lewis, Criminal No. 3:12cr156(VLB).   And on November 20, 2012, Judge Arterton sentenced Adam Petrowski to 44 months after he pled guilty to receipt and distribution of child pornography.   See United States v. Adam Petrowski, Criminal No. 3:12cr184(JBA).

Many defendants have received sentences of probation or very little jail time in cases involving only possession.   See, e.g., United States v. Nathan Adams, 3:98cr66(AWT)(sentence of probation); United States. v Roland McKay, 3:01cr117(EBB)(sentence of five years probation); United States v. Lawrence Collier, 3:05cr305(RNC)(sentence of probation); United States v. Christopher House, 3:09cr26(RNC)(sentence of 12 months' incarceration); United States v. Matthew Dole, 3:06cr262(RNC)(sentence of 12 months' imprisonment); United States v. Joseph Laugher, 3:12cr102(JCH)(sentence of 18 months' imprisonment).   In sum, where a

defendant has produced child pornography or sexually abused a minor in the past, a sentence in the 10 to 20-year range has been customary in this District.   Such a sentence reflects a higher mandatory minimum penalty and also a notion that incapacitation becomes one of the major factors.   In receipt and distribution cases where there is no evidence that the defendant ever had any sexual contact with a minor, sentences at the five-year range are customary in this District.

In short, to avoid unwarranted sentencing disparities between defendants with similar records and convicted of similar offenses, a sentence of 60 months, along with five years of supervised release in this case is warranted.

V.      Conclusion

Child pornography is a crime that causes people to cringe, and understandably so.   But sentences have to be based on the evidence and not emotion; they must be individualized, fair, and proportionate, while advancing the purposes of sentencing. Reform to the child pornography guideline is imperative.   The Commission took steps to illuminate the problems in an initial report in 2009, and it is presently in the process of formulating suggested reforms.   See Public Hearing Transcript, U.S. Sent'g Comm'n, Public Hearing on Child Pornography Crimes, February 15, 2012 (Washington                          D.C.),                    *available*                    *at*: http://www.ussc.gov/Legislative_and_Public_Affairs/Public_Hearings_and_Meetings /20120215-16/Agenda_15.htm.   Until that reform becomes a reality, however, this Court should give very little weight to the problematic guideline and craft a sentence that fits the crime and the offender.   Based on the kinds of sentences available to the Court, all of the other sentencing factors, and Mr. Millett's strong grounds for a

departure/variance, a sentence of 60 months' imprisonment is a sentence sufficient, but not greater than necessary.

Respectfully submitted,

THE DEFENDANT,
 William Millett

FEDERAL DEFENDER OFFICE

Dated: September 26, 2018          */s/Kelly M. Barrett*
Kelly M. Barrett
First Asst. Federal Defender
265 Church Street, Suite 702
New Haven, CT 06510
Bar No. ct27410
Email: kelly_barrett@fd.org

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 26, 2018, a copy of the foregoing Defendant's Memorandum in Aid of Sentencing was filed electronically and served by mail on anyone unable to accept electronic filing.   Notice of this filing will be sent to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/Kelly M. Barrett*
Kelly M. Barrett

32